Joseph R. Johnson, Esquire
**Searcy Denney Scarola Barnhardt & Shipley, P.A.**
2139 Palm Beach Lakes, Boulevard
West Palm Beach, Florida 33408
Phone: (561) 686-6300
Fax: (561) 264-0544
jjohnson@searcylaw.com
johnsonteam@searcylaw.com

*Attorney for Defendant*
*MICHAEL HIBNER, M.D*.

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| COLOPLAST CORP, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:25-mc-00026-MTL |
| | ) |
| v. | ) [Underlying action pending in the |
| | ) United States District Court for the |
| MICHAEL HIBNER, M.D., | ) Middle District of Florida: *Diana Dyer* |
| | ) *v. Coloplast Corp., et al.*, Case No. |
| Defendants. | ) 8:24-cv-02867-VMC-SPF] |
| | ) |
| | ) |

**DEFENDANT MICHAEL HIBNER, M.D.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL COMPLIANCE[1] WITH AND ENFORCE NON-PARTY SUBPOENA AND MEMORANDA IN SUPPORT**

Pursuant to Federal Rules of Civil Procedure 26 and 45, Dr. Michael Hibner hereby responds in opposition Plaintiff's motion to compel and would show the Court as follows:

---

[1] Dr. Hibner does not oppose transfer to the Middle District of Florida.

1

**INTRODUCTION**

Dr. Michael Hibner, a nonparty from whom the Coloplast seeks production via subpoena, is the treating physician who ultimately removed defective pelvic mesh from the plaintiff in the underlying suit, Diana Dyer. Ms. Dyer brought the underlying suit against Coloplast Corp. and Coloplast Manufacturing US, LLC wherein she alleges that she has been permanently injured by Coloplast's defective pelvic mesh that was implanted into her for treatment of stress urinary incontinence.

Although the subpoena was not properly served on Dr. Hibner, as discussed below, Dr. Hibner has produced documents that he believed were responsive and not protected from disclosure.  Dr. Hibner does not object to production of the documents responsive to request 1 (seeking Dr. Hibner's C.V.) or requests 2, 3, 4, 6, 11, and 12 of the subpoena, as those requests are properly limited in scope to Plaintiff Diana Dyer. No responsive documents exist for requests 8-10, although most of those request are over broad.

With regard to requests, 5, 7, and 13, Coloplast's subpoena is calculated to force Dr. Hibner to violate the doctor-patient and privacy privileges of countless number of patients who are not parties to the underlying lawsuit and to expend significant resources in searching for and producing irrelevant documents or documents that are not proportionate to the issues because it is unlimited in time and significantly overly broad in scope. The subpoena places Dr. Hibner in the unenviable position of either defying a Federal Court subpoena [that was not properly served] or violating his ethical duties to his patients and his obligations under Federal privacy law. Because the subpoena was not properly served, Plaintiff's motion should be denied.  Further, because the subpoena seeks production of irrelevant privileged information

and is unduly broad and burdensome, it should be quashed or modified and Dr. Hibner should be grated protection, as requested in his separately filed motion.[2] A chart of the requests, objections, and whether documents have been produced, is attached hereto as Exhibit 1.

## BACKGROUND

**A.    Dr. Michael Hibner, the Arizona Center for Chronic Pelvic Pain, and relationship with Plaintiff Diana Dyer.**

Dr. Hibner has devoted much of his professional career to the treatment of obstetric and gynecological problems, in particular pelvic floor neuralgias and pelvic pain. Ex. 2, Hibner C.V. He has taught medical students in issues related to female pelvic dysfunction and treatment of related pain. *Id*. at 2. His OB/GYN board certifications include Board Certification in Female Pelvic Medicine and Reconstructive Surgery by the American Board of Obstetrics and Gynecology. *Id*. at 2-3. He has authored chapters for medical texts, peer reviewed and nonpeer reviewed journal articles, and abstracts related to female pelvic pain. *Id*. at 5-8. He is a frequent lecturer on pelvic pain related issues at seminars, conferences, and symposia. *Id.* at 8-27. He is the author of a practice manual regarding management of chronic pelvic pain. Hibner, M. 2021. *Management of Chronic Pelvic Pain: A Practical Manual*. Cambridge University Press.  ISBN: 9781108892537. April 2021. His work has been relied upon in court by other physicians. *See O'Bryant v. Johnson & Johnson*,[3] No. 202361 (MAS)(DEA), 2022 U.S. Dist. LEXIS 187758 at *23-25 (D.N.J. Oct. 13, 2022).

---

[2] A separate motion to quash and for protection has been filed by Dr. Hibner in the underlying action in the Middle District of Florida.

[3] Plaintiffs' counsel in *O'Bryant* is reported as being Christopher Michael Placitella and Jillian A.S. Roman, Cohen Placitella & Roth PC. *O'Bryant*, 2022 U.S. Dist. LEXIS 187758 at *1.

In 2020, Dr. Hibner left St. Joseph's Hospital and Medical Center, Phoenix, and opened his private practice, the Arizona Center for Chronic Pelvic Pain ("AZCCPP"). Ex. 3, Hibner Decl. at ¶2. To inform and educate women suffering from pelvic floor issues and pudendal neuralgias, Dr. Hibner and the AZCCPP maintain an active Facebook page, www.facebook.com/MichaelHibnerMD, and a website, www.AZCCPP.com, where his credentials and contact information are available. He has also launched a YouTube channel, "Questions that Need Answers with Dr. Michael Hibner," where he answers questions primarily related to chronic pelvic pain.

Dr. Hibner's unique expertise and willingness to treat mesh related pelvic pain and remove pelvic mesh from women when other doctors are unwilling or unable to do, has attracted women suffering from chronic pelvic pain[4] from across the United States to his clinic in Arizona for treatment. Ex. 3, Hibner Decl. at ¶2. Dr. Hibner has, on occasion, been noticed for deposition related to his treatment of his patients, and has also been retained by counsel for plaintiffs as an expert in some mesh cases where plaintiffs were represented by counsel other than Plaintiff's Counsel herein.[5] Although Dr. Hibner has been noticed for deposition or provided expert services for some mesh patients, it is entirely possible, given the breath of pelvic mesh litigation,

---

[4] As of April 24, 2023, all of Dr. Hibner's patients suffered from chronic pelvic pain, approximately one-third of them had pain from conditions unrelated to mesh. Ex. 4, *Dandy v. Ethicon*, No. 20-cv-413-MAS (D.N.J. April 24, 2023) at 348:10-25. Dr. Hibner testified as a treater. *Id*. at 275:1-4.

[5] In addition to Ms. Dyer and the case, *Cubias*, where the list was recently produced, to Dr. Hibner's knowledge, he has treated eight other patients who are represented by Ms. Dyer's counsel. Ex. 5, Dr. Hibner's list.

that unbeknownst to Dr. Hibner, some of his other patients have pelvic mesh lawsuits.[6] Ex. 3, Hibner Decl. at ¶4. However, the crux of his practice has been and is dedicated to the treatment of women suffering from chronic pelvic pain, not service as a "testifier" or retained expert in pelvic mesh litigation. Notably, Dr. Hibner has not been retained as an expert in this case for Plaintiff Diana Dyer, nor was Ms. Dyer referred by counsel to Dr. Hibner for treatment. *Id.* at ¶8.

Dr. Hibner has seen approximately 2000 patients at AZCCPP; some have had implanted mesh, while some have not. *Id.* Dr. Hibner's office routinely receives requests for medical treatment records and/or billing for his patients, accompanied by an authorization for release of medical information for that particular patient. Ex. 6, Nunez Decl. at ¶2. These requests are not necessarily related to pelvic mesh lawsuits and may be related to various things, such as patient requests for records, insurance claims, or requests from other physicians, or lawsuits arising from issues other than pelvic mesh, like automobile accident claims. *Id*. Dr. Hibner and AZCCPP do not keep a record of those requests except to the extent that the requests may be saved in the individual patient files and those patient files, although electronic, are searchable only by patient name and date of birth. *Id.*

After unsuccessful treatment in her home state of Florida, Plaintiff Diana Dyer's Coloplast Aris mesh sling was removed by Dr. Hibner in Arizona in November 2021. As far as Dr. Hibner is aware, she was not sent to him by an attorney. Ex. 3, Hibner Decl. at ¶8. He has not received any compensation for treating Ms. Dyer from her counsel, nor has Ms. Dyer's

---

[6] It has been estimated that over 100,000 pelvic mesh lawsuits have been filed in the United States. Before they concluded, 7 separate pelvic mesh MDLs were pending in U.S. District Court for the Southern District of West Virginia. Other cases were or are still being filed in state and federal courts.

counsel promised or guaranteed payment for such treatment.[7] *Id.* at ¶6. Dr. Hibner does not recall having ever accepted a "letter of protection" from an attorney and does not have a letter of protection or guarantee of payment from any attorney for Ms. Dyer. *Id*. Aside from routine records requests that AZCCPP may have received, i.e., requests for medical/treatment records and/or billing for the patient that went through his Practice Manager or Billing Manager, until his office was [ineffectively] served with the subpoena from Coloplast counsel, Dr. Hibner was not aware that Ms. Dyer was represented by counsel with regard to a mesh lawsuit. *Id.* at 8.

**B.      The subpoena and document requests were not properly served.**

On May 5, 2025, the Coloplast Defendants attempted to serve the attached subpoena on Dr. Hibner, Plaintiff's treating physician and a non-party to this action. Ex. 7, subpoena. That subpoena is directed to Dr. Hibner, individually, not his practice or the custodian of records for him or his practice, and the list of documents requested is far exceeds that of the routine medical and billing records request. While Dr. Hibner was out of the office, Tiffany Rezende, an independent contractor non-employee physical therapist in Dr. Hibner's office was improperly served with the subpoena. Ex. 8, return of service; Ex. 9, Rezende Decl. at ¶¶1,2,3. Ms. Rezende was not authorized to accept service on behalf of Dr. Hibner, individually. Ex. 3, Hibner Decl. at ¶7; Ex. 9, Rezende Decl. at ¶1. Per Ms. Rezende, after she told the process server that Dr. Hibner was not available, she was not asked if she was authorized to accept service for Dr. Hibner and was only asked by the process server to give the documents to Dr. Hibner. Ex. 6,

---

[7] Dr. Hibner has testified that to his knowledge, no attorneys have paid him for patient care and such patient charges have not been paid by litigation funding companies. Ex. 4, excerpt *Dandy* trial transcript at 347:22-348:4.

Rezende Decl. at ¶2,3.[8] Her understanding is that she was just passing the documents on to Dr. Hibner. *Id.* To date, Dr. Hibner has not actually been served. Ex. 3, Hibner Decl. at ¶7. Because the subpoena was not properly served, Dr. Hibner should not be compelled to respond.

The proposed [but not properly served] subpoena seeks production of thirteen document categories, many of which are unduly burdensome as compliance would require a manual search of all nearly 2000 patients' files, and/or are improper because they request documents the production of which without patient consent would violation federal privacy law, the constitutional right to privacy, and the physician-patient privilege. Further, these non-party documents are not relevant or likely to lead to the discovery of admissible evidence in this case. Thus, good cause exists for to the subpoena to be quashed or modified and Dr. Hibner, and by extension his non-party patients, be granted protection from the subpoena.[9] *See* Fed. R. Civ. P. 26(c)(1) and (4) and 45(d)(3)

**C.      Memorandum of law.**

**1.      Patient privacy under HIPAA prohibits disclosure of the other patients' information.**

The Health Insurance Portability and Accountability Act (HIPAA) establishes federal standards protecting health information from disclosure without patient consent. *See* 42 U.S.C. 1320d, *et seq.* The US Department of Health and Human Services issued the HIPAA Privacy

---

[8] The process server is also incorrect regarding Ms. Rezende's age and weight. Ex. 9, Rezende Decl. at ¶3.

[9] In response to the Notice of Intent to Subpoena filed in the Middle District of Florida in the underlying case, counsel for Ms. Dyer has filed a Motion to Quash and for Protective Order wherein she also requests protection related to attorney client and work product privileges.

Rule to implement HIPAA requirements. The Privacy Rule protects all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. 45 C.F.R. § 160.103. Covered entity includes health care providers. *Id*. A covered entity must obtain the individual's specific written authorization for any use or disclosure of protected health information that is not for treatment, payment for health care operations or otherwise permitted or required by the Privacy Rule. 45 CFR § 164.532. Failure to comply with the obligations imposed by HIPPA can result in monetary sanctions and/or criminal penalties for each violation for both the one disclosing and the one obtaining the information. *See* 42 U.S. Code § 1320d-6; 45 C.F.R. Part 102; 89 Fed. Reg. 64815 (Aug. 8, 2024) (*HHS, Annual Civil Monetary Penalties Inflation Adjustment*).

HIPAA protected health information is broader than just medical information or records or billing information related to health care. Absent authorization by the patient, HIPAA prohibits, *inter alia*, disclosure of patient names, addresses, health conditions, that care was provided and what care, and whether or how payment was provided. *See* 45 C.F.R. 106.103. To comply with HIPAA, "de-identified" information may be disclosed as follows:

> The following identifiers of the individual must be removed to achieve the "safe harbor" method of de-identification: (A) Names; (B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of Census (1) the geographic units formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and (2) the initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000; (C) All elements of dates (except year) for dates directly related to the individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age,

except that such ages and elements may be aggregated into a single category of age 90 or older; (D) Telephone numbers; (E) Fax numbers; (F) Electronic mail addresses: (G) Social security numbers; (H) Medical record numbers; (I) Health plan beneficiary numbers; (J) Account numbers; (K) Certificate/license numbers; (L) Vehicle identifiers and serial numbers, including license plate numbers; (M) Device identifiers and serial numbers; (N) Web Universal Resource Locators (URLs); (O) Internet Protocol (IP) address numbers; (P) Biometric identifiers, including finger and voice prints; (Q) Full face photographic images and any comparable images; and ® any other unique identifying number, characteristic, or code, except as permitted for re-identification purposes provided certain conditions are met. In addition to the removal of the above-stated identifiers, the covered entity may not have actual knowledge that the remaining information could be used alone or in combination with any other information to identify an individual who is subject of the information.

45 C.F.R. § 164.514(b); www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html#what.

A healthcare provider may only waive or break the privacy protections and provide the minimum information "as necessary to treat the patient or to treat a different patient" under very limited situations (*see* 45 CFR §§ 164.502(a)(1)(ii), 164.506(c)): in the case of a public health emergency to a public health authority (*see* 45 CFR 164.512(b)(1)(i)); to a foreign government agency at direction of a public health authority (*see* 45 CFR §§ 164.501; 164.512(b)(1)(i)); to persons at risk of contracting a disease if authorized by state law (*see* 45 CFR 164.512(b)(1)(i)); under certain circumstances related to informing a patient's family (*see* 45 CFR 164.510(b)); or in case of imminent danger (*see* 45 CFR 164.512(j)). *See* Nov. 2014 U.S. Dept. HHS Office for Civil Rights Bulletin HIPAA Privacy in Emergency Situations (attached hereto as Ex. 10.)

While HIPAA does allow disclosure of protected information in response to a subpoena in a judicial proceeding, the medical records holder must receive

satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or [t]he covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

*See* 45 C.F.R. § 164.512.

> **2.** **Physician-patient privilege prohibits disclosure of other patients' information.**

Movant proposes that the privilege law of Arizona, as the state with the most significant relationship to the physician-patient relationship between Ms. Dyer and Dr. Hibner, applies to the assertion of the physician patient privilege in this circumstance. *See Lion Elec. Co. v. Nikola Corp.*, No. CV-23-00372-PHX-DGC, 2024 U.S. Dist. LEXIS 165030 at *2-5 (D. Ariz. Sep. 13, 2024). Under Arizona law, communications between a physician and patient, as well as medical records, are privileged. A.R.S. §§ 12-2235, 12-2292; *Heaphy v. Metcalf*, 249 Ariz. 210, 212, 468 P.3d 763, 765 (Ct. App. 2020). Specifically, the physician-patient privilege in Arizona provides as follows:

> In a civil action a physician or surgeon shall not, without the consent of his patient, or the conservator or guardian of the patient, be examined as to any communication made by his patient with reference to any physical or mental disease or disorder or supposed physical or mental disease or disorder or as to any such knowledge obtained by personal examination of the patient.

Ariz. Rev. Stat. § 12-2235. Further,

> [u]nless otherwise provided by law, all medical records and payment records, and the information contained in medical records and payment records, are privileged and confidential. A health care provider may only disclose that part or all of a patient's medical records and payment records as authorized by state or federal law or written authorization signed by the patient or the patient's health care decision maker.

Ariz. Rev. Stat. § 12-2292 (A). The physician-patient privilege belongs to the patient and thus, cannot be waived by the patient's doctor. *See Sun Health Corp. v. Myers*, 205 Ariz. 315, 318, 70 P.3d 444, 447 (Ct. App. 2003) citing *State v. Dumaine*, 162 Ariz. 392, 406, 783 P.2d 1184, 1198 (1989). Even if the Court applies Florida law, the physician-patient privilege would prohibit disclosure of the medical records and records of patients who are not party to the suit and the privilege belongs to the patient, not the physician. *See* Fla. Stat. Ann. § 456.057; *see also State v. Carter,* 177 So. 3d 1028, 1031 (Fla. Dist. Ct. App. 2015) (physician patient privilege belongs to the patient).

3.      **The scope of the information sought must be proportionate to the case and the party's interest in obtaining must be balanced against nondisclosure.**

Federal Rule of Civil Procedure Rule 26(b)(1) places important limits on discovery: it must be, among other things, "relevant to any party's claim or defense" and "proportional to the needs of the case." This extends to discovery obtained by subpoena, where the Rules impose the responsibility on a party or attorney serving a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

Pursuant to Rule 26, a "party or any person from whom discovery is sought may move for a protective order . . . ." Fed. R. Civ. P. 26(c)(1). The court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* Good cause "generally signifies a sound basis or legitimate need to take judicial action." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987). The district court is to balance the party's interest in obtaining documents against the interest in keeping

documents from disclosure." *See Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001).

### 4. Undue Burden.

To identify and redact responsive documents to Defendants broad requests would place an undue burden on Dr. Hibner and, by extension, his patients, particularly given that those documents relate to non-parties whose information is not relevant to the issues in the underlying case between Ms. Dyer and Coloplast.  Dr. Hibner's unique expertise and willingness to remove pelvic mesh from women when other doctors are unwilling or unable to do, has attracted women suffering from chronic pelvic pain from across the United States to his clinic in Arizona for treatment. Ex. 3, Hibner Decl. at ¶2. Although Dr. Hibner has been noticed for deposition or provided expert services for some mesh patients, given the breath of pelvic mesh litigation, it is entirely possible that unbeknownst to Dr. Hibner, some of his other patients have pelvic mesh lawsuits.[10] Ex. 3, Hibner Decl.at ¶4. Notably, Ms. Dyer was not referred by an attorney to Dr. Hibner for treatment, and payment for her care was not guaranteed by or paid for by her counsel. *Id.* at ¶¶4, 6.

Dr. Hibner has seen approximately 2000 patients, both male and female, at AZCCPP; not all female patients have pelvic mesh. Ex. 3, Hibner Decl. at ¶2. Dr. Hibner's office routinely receives requests for medical records and/or billing for his patients, accompanied by an

---

[10] It has been estimated that over 100,000 pelvic mesh lawsuits have been filed in the U.S. Seven pelvic mesh MDLs against major manufacturers were pending in U.S. District Court for the S.D. W. Va., alone. Cases were or are still being filed in state and federal courts.

authorization for release of medical information for that particular patient. Ex. 6, Nunez Decl. at ¶2. These requests are not necessarily related to pelvic mesh lawsuits and may be related to patient requests for records, insurance claims, requests from other physicians, or lawsuits arising from issues other than pelvic mesh, like automobile accident claims. *Id*. Dr. Hibner and AZCCPP do not keep a record of those requests except to the extent that the requests may be saved in the individual patient files and those patient files, although electronic, are searchable only by patient name and date of birth. *Id.* To require a manual search through nearly 2000 patient files to determine whether there are responsive documents reflecting "communications" between Ms. Dyer's counsel or any other attorney related to, for example, medical records requests that may have been made for some patients' records, would impose an undue burden on Dr. Hibner and his practice, thus affecting his patients. Ex. 3, Hibner Decl.at ¶3; Ex. 6, Nunez Decl. at ¶¶3,4,5,6. Dr. Hibner's Practice Manager has estimated that assuming she could find qualified individuals to work at Arizona's minimum wage, a review of all nearly 2000 files would take an estimated 1000 to 2000 hours, cost between $14,700 and $29,400, and require her to spend time away from her duties to hire, train, and supervise the reviewers. *Id.*. To have the staff perform the review outside of their normal duties and hours would require overtime and thus, it would be expensive because overtime pay would be required. *Id.* Per Ms. Nunez, to have to then redact in accordance with HIPAA would be similarly onerous. *Id.*

With regard to expert services that Dr. Hibner has provided, the requests seek communications beyond those related to Plaintiff, Plaintiff's counsel, and beyond those related to Coloplast. *See, e.g.*, Ex. 1 at requests 5, 7, 13(d). Thus, they exceed the proper scope of discovery from a treating or expert physician. *See Crespo v. Home Depot U.S.A., Inc.*, No. 16-

60086-CIV-COHN/SELTZER, 2016 U.S. Dist. LEXIS 92147, at *15-16 (S.D. Fla. July 15, 2016) (Objection to production of the underlying billing and financial records that do not pertain to plaintiff sustained as burdensome and invasive).

Coloplast inappropriately seeks to enlarge the scope of Section 768.0427(3)(2) of the Florida statutes which provides as follows:

> (3) LETTERS OF PROTECTION; REQUIRED DISCLOSURES.—In a personal injury or wrongful death action, as a condition precedent to asserting any claim for medical expenses for treatment rendered under a letter of protection, the claimant must disclose:

> (e) Whether the claimant was *referred for treatment* under a letter of protection and, if so, the identity of the person who made the referral. If the referral is made by the claimant's attorney, disclosure of the referral is permitted, and evidence of such referral is admissible notwithstanding s. 90.502. Moreover, in such situation, the financial relationship between a law firm and a medical provider, including the number of referrals, frequency, and financial benefit obtained, is relevant to the issue of the bias of a testifying medical provider. (emphasis added).

As previously noted, Dr. Hibner does not have a Letter of Protection or other guarantee of payment from Ms. Dyer's counsel, does not believe that Ms. Dyer was referred to him by counsel for treatment, and is not aware of any patients referred to him for treatment by Ms. Dyer's counsel. Ex. 3, Hibner Decl. at ¶¶6,8.

Communications related to patients or plaintiffs other than Ms. Dyer would also implicate HIPAA, particularly because no waiver has occurred in this case for those nonparty patients and Dr. Hibner cannot waive the privilege for patients. Further, for each case that he has reviewed, provided an opinion to counsel, and/or testified Dr. Hibner cannot ascertain whether he has been formally designated as an expert witness and that the required disclosure has occurred in each case. This raises attorney work product issues, in addition to privacy issues.

With regard Defendants argument that production of such a broad description of documents (communications re: any other plaintiff, any other pelvic mesh defendant, or any other law firm) is necessary to demonstrate bias is faulty because Dr. Hibner has already provided the Coloplast with invoices and will supplement this production should subsequent similar invoices be generated for expert services provided to Plaintiff's Counsel, regardless of Defendant, in cases where expert disclosures have been made. In connection with another case where one of Dr. Hibner's patients is represented by Ms. Dyer's counsel, in addition to that patient's medical and billing records, Dr. Hibner has produced invoices related to his depositions, expert services, and trial testimony for eight other cases involving Ms. Dyer's counsel.

As noted above, Dr. Hibner has been previously testified as a treating physician and/or provided expert services, such as an independent medical examination and/or trial testimony for nine of Plaintiff's counsel's clients. To the extent those services can be considered a "referral," the invoices for those cases were previously provided and he has testified regarding those charges. To his knowledge, he has never been referred a patient by Plaintiff's counsel for treatment. Ex. 3, Hibner Decl.at ¶¶4,5,8. Assuming counsel asking Dr. Hibner to perform services referenced above could be construed a "referral," production of *all documents* "reflecting any patients Diana Dyer's Counsel referred to you" or otherwise requested for patients other than Ms. Dyer or any case that did not involve a Coloplast product (where Coloplast Counsel would already have the medical records and billing and has Dr. Hibner's invoices) would involve production of protected health information for the underlying claims that would violate those individuals' privacy interests and would be not be relevant in this case.

Further because the HIPAA "satisfactory assurance" obligation for disclosure in response to subpoena has not been met by Defendants, Dr. Hibner should not be forced to respond.

## CONCLUSION

WHEREFORE, Dr. Hibner respectfully requests that the Court deny Plaintiff's motion.

Dated June 30, 2025.


**I HEREBY CERTIFY** that this has been Filed electronically with the Court and COPIES of the foregoing sent by e-mail transmission from the USDC SD of FL CM ECF Portal this 30th day of June, 2025 to:

**Kathryn E. Bettini**
4800 North Scottsdale Road, Suite 2200
Scottsdale, Arizona 85251

**David J. Walz**
CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 West Boy Scout Boulevard, 10th Floor (33607)
Tampa, Florida 33601

**Filiz Akkaya**
CARLTON FIELDS, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401-6350

**SEARCY DENNEY SCAROLA**
**BARNHART & SHIPLEY, P.A.**

*/s/ Joseph R. Johnson*
**JOSEPH R. JOHNSON**
Florida Bar No. 372250
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Office: 561.686.6300
johnsonteam@searcylaw.com

**ATTORNEYS FOR DEFENDANT,**
**DR. MICHAEL HIBNER**